# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| TARA J. MUELLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No: 07 C 4600 |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Tara Mueller, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2); 1382c(a)(3)(A). Ms. Mueller asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.[1]

## I.
## PROCEDURAL HISTORY

Ms. Mueller applied for DIB and SSI on July 19, 2004, alleging that she had been disabled since June of 2002, as a result of depression, bipolar disorder, protein S deficiency, deep vein thrombosis, congenital blocked vertebrae, irritable bowel

---

[1] Ms. Mueller was given the opportunity to file a reply memorandum in this case by May 6, 2008. (Dkt. # 15). By that date, Ms. Mueller had neither filed a reply brief nor sought an extension of time in which to do so. As a result, she has waived her right to present a reply. N.D.Ill.Local Rule 78.3.

syndrome, mitral valve prolapse, and degenerative disc disease. (Administrative Record ("R.") 42-44, 65, 212-15). Her application was denied initially and upon reconsideration. (R. 26-31, 217-221). Ms. Mueller continued pursuit of her claim by filing a timely request for hearing on November 28, 2005. (R. 36).

An administrative law judge ("ALJ") convened a hearing on February 8, 2007, at which Ms. Mueller, represented by counsel, appeared and testified. (R. 224-254). In addition, Edward Pagella testified as a vocational expert. (R. 245-53). On February 28, 2007, the ALJ issued a decision denying Ms. Mueller's application for DIB and SSI because she could perform unskilled light and sedentary work with a sit/stand option – work which exists in significant numbers in the national economy. (R. 12-21). This became the final decision of the Commissioner when the Appeals Council denied Ms. Mueller's request for review of the decision on June 14, 2007. (R. 5-7). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Mueller has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Ms. Mueller was born on December 2, 1966, making her forty years old at the time of the ALJ's decision. (R. 60, 83, 224). She is 5' 4" and weighs 190 pounds. (R. 64). She has a high school education. (R. 19, 71). She has worked as an information clerk, a receptionist, a cook, a cashier, and a retail clerk, bouncing from job to job,

working for more than three dozen employers in about twenty years. (R. 19, 47-59, 66). There have been times in her life where she had nine W-2s in a year. (R. 162). When she filed her disability report in June 2005 (R. 75), she was working part-time as a cook. (R. 65). She said she was doing that because she could not longer do waitress work because of her back problems. (R. 65).

In between jobs, Ms. Mueller has spent some time in Illinois's prison system, from late 2003 to May 2004 (R. 70, 102, 116 *et seq.*, 234), and from August to November of 2005 (R. 208, 234), for forging checks, retail theft, and possession of crack cocaine. (R. 155, 234). She was convicted of driving under the influence in 2000. (R. 234). Ms. Mueller used crack for a year before her imprisonment in 2003, and drank 6 to 12 beers a day for twenty years prior to that as well. (R. 140). She was back on cocaine before her second imprisonment in 2005. (R. 208).

### B.
### Medical Evidence

The medical evidence in this case is somewhat superficial, consisting almost entirely of cursory jottings – many illegible – from healthcare professionals who kept track of Ms. Mueller while she was incarcerated. (R. 116-144). Indeed, the record is so sparse that Ms. Mueller summarizes it in just twelve sentences in her memorandum in support of her motion for summary judgment. No physician, psychiatrist, or healthcare professional has suggested that Ms. Mueller suffers from any disabling impairment.

In August of 2000, Ms. Mueller had laboratory tests that were normal in terms of glucose, BUN, creatinine, protein, and cholesterol levels. (R. 109-111). Another laboratory test in October of 2000, demonstrated normal protein levels. (R. 108). Ms.

3

Mueller underwent urinalysis in December of 2000, and that was normal aside from slightly elevated chloride and an elevated BUN\creatinine ratio. (R. 104-05). In May of 2001, Ms. Mueller had a blood test that was positive for rheumatoid arthritis. (R. 103).

Notably, Ms. Mueller alleged that she became disable in June of 2002, but there is no further record of any treatment or physician visits until she was incarcerated in the fall of 2003. During her prison term, she worked in the kitchen. (R. 162). She underwent an initial psychiatric evaluation on October 30, 2003. Dr. Naidu noted her history of panic disorder and treatment with Efexor. (R. 155). Ms. Mueller was oriented but anxious. (R. 155). Memory was intact; intellect and judgment were okay. (R. 155). She denied any hallucinations or suicidal ideation. (R. 155). Dr. Naidu continued her treatment with Efexor. (R. 155).

On December 17, 2003, she had a physical examination that was normal, including normal strength and range of motion in her upper and lower extremities. (R. 139). It was noted that she had a history of bipolar disorder since 1996, protein S deficiency, and substance abuse. (R. 139-40). Her bipolar disorder was treated with Efexor. (R. 142). There was also mention of a mitral valve prolapse.[2] (R. 139, 142). Lab results – glucose, BUN, creatinine, chloride, cholesterol, etc. – were normal. (R. 143).

---

[2] Mitral valve prolapse (MVP) is a disorder in which the valve cusps bulge into the left atrium during contraction of the left ventricle, sometimes allowing leakage or "regurgitation of small amounts of blood into the atrium. MVP is usually benign and asymptomatic, and does not require treatment. Complications include mitral regurgitation, endocarditis, valve rupture, and possibly thromboembolism. There are reports that some patients experience chest pain, dyspnea, dizziness, and palpitations. www.merck.com

In January of 2004, it was noted that Ms. Mueller had an interior vena cava filter (Greenfield filter); a device surgically implanted inside the blood vessel to trap clots. (R. 134). At that time, Ms. Mueller's last incident of deep venous thrombosis was in 1997. (R. 134). Other notes during that period also reference her history of protein S deficiency (R. 137, 139). Still others mention her allergy to Tegretol, a drug used to treat bipolar disorder (R. 117-19), or her allergy to Coumadin, a blood thinner. (R. 133, 137, 142). Others make note of minor injuries sustained and treated in prison (R. 129), and complaints of indigestion. (R. 134).

Ms. Mueller had a mental health evaluation on March 10, 2004. She said she had been suffering mood swings from depressed to manic of late. She had no overt symptomatology other than slightly pressured speech at times. She denied any suicidal thoughts since 2002. (R. 126). She reported some problems with concentration, particularly when reading. Ms. Mueller was alert, oriented, and exhibited a normal memory. Her fund of knowledge and intellect were average. (R. 127). Judgment and insight were good. (R. 127). Diagnosis was alcohol and cocaine dependence in remission and bipolar disorder. (R. 127).

She underwent a psychological consult on October 6, 2004, with Dr. John Peggau. She reported that she went on medical leave from her waitressing job in June of 2002, and that they no longer needed her when she returned. (R. 162). At the time of the consult, she was working behind a grill for four hours every day. (R. 162). She related that she had a daughter, but had given her to her grandparents to raise because of her work schedule as a bartender. (R. 161-62). Her day consisted of getting up between 7

5

and 8 a.m., getting ready for work, putting in her shift at the grill, and then attending caseworker, probation, and drug counselor meetings. (R. 163). She played pool twice a week in a league, and did her own laundry, grocery shopping, cooking, and cleaning. (R. 163). She reported that she had difficulty sleeping. (R. 163). Her mental status exam was average. (R. 163). She could relate current events, perform the complete serial seven subtraction from 100, and perform simple arithmetic. (R. 163). She had average recall. (R. 164). She was able to understand, remember, and execute instructions, sustain concentration and persist in some tasks, and interact socially and adapt to work settings. (R. 164).

Less than a week later, Ms. Mueller went for a consultative physical examination, performed by Dr. C.J. Wonais. She related a history of congenitally locked cervical vertebrae, which caused pain radiating down both her arms every 3-4 weeks lasting 2 or 3 days. (R. 166). She said she had a history of mitral valve prolapse but no evidence of regurgitation. (R. 166). Ms. Mueller indicated that she had suffered from degenerative disk disease in her lumbar spine since she was in eighth grade, with the pain being constant, radiating down her legs, and 10 on a scale of 10. (R. 166). Her back went out two or three times a year. (R. 167). Heart and lung sounds were normal. (R. 167). Her gait was normal. (R. 167). There was no edema, cyanosis, or clubbing in her extremities, and no varicose veins. (R. 167). Ms. Mueller had a normal range of motion in all her joints, and was able to heel-toe walk, squat, and get up and down from the examination table without difficulty. (R. 167). Grip strength and dexterity in both hands

6

were normal. (R. 167). Cranial nerves, and motor, sensory, and reflex examination were all normal. (R. 167).

Dr. Phyllis Brister, an Agency physician, reviewed Ms. Mueller's psychiatric file on November 7, 2004. The doctor felt she was mot significantly limited by her mental condition, aside from being moderately limited in the ability to understand and remember detailed instructions, and work in coordination with others without being a distraction. (R. 169). Ms. Mueller was "independent in [activities of daily life] and cognitively intact." (R. 171). She could understand, recall, and execute at least simple instructions and was capable of performing simple work activity. (R. 171).

Dr. Sandra Blinsky performed a similar review of Ms. Mueller's medical file on November 23, 2004. She felt that Ms. Mueller could lift 20 pounds occasionally and 10 pounds frequently, and stand, sit or walk for six hours in an eight-hour work day. (R. 188). She could not climb ladders, ropes, or scaffolds. (R. 189).

Upon returning to prison in 2005, Ms. Mueller underwent another intake evaluation. She said she took one baby aspirin a day for blood clots. (R. 208). She related that her mental state had been stable on Efexor and Serequel, but that that had ended with her return to using cocaine. (R. 208). She complained of mood swings and panic attacks. (R. 208). Her thought process was intact, although there was slight looseness of associations and verbosity. (R. 208). Alertness, consciousness, orientation, and memory were all within the normal range. (R. 208). Judgment and insight were good. (R. 209).

In July of 2006, Ms. Mueller was complaining of left leg pain, after being kicked in the calf by her boyfriend. (R. 194, 203). Two successive Doppler ultrasound studies revealed a nonocclusive thrombus in the left popliteal vein to the distal posterior tibial vein. (R. 195). There was normal compressiblility of the femoral arteries, as well as improved flow in course of a week. (R. 194-195). By August 30th, however, the thrombus had progressed and was occlusive. (R. 196). Femoral and calf veins retained normal appearance, color-flow, respiratory variability, and compression. (R. 196).

On December 8, 2006, Ms. Mueller went to the emergency room with complaints of left leg pain and swelling. (R. 200, 203). She had been doing well before that. (R. 200, 203). She explained that she had been working as a waitress until July of 2006 when she was diagnosed with deep venous thrombosis. (R. 204). Examination revealed swelling in her left leg and non-pitting edema and positive Homan's sign. (R. 200). A CT revealed extensive pulmonary emboli. (R. 200). It was difficult to tell if Ms. Mueller was being compliant with her DVT medication (Lovenox). (R. 200). Physicians performed a complete workup and determined the best course was to implant a second filter, this one a suprarenal IVC filter, and for Ms. Mueller to undergo procedures to break up the clot. (R. 200). By December 14th, there was marked improvement in blood flow. (R. 201). Leg swelling subsided. (R. 201). Aspirin, Plavix, and Lovenox were prescribed for the next nine months. (R. 201). On January 16, 2007, Ms. Mueller's follow-up examination was normal, including lungs, cardiovascular, musculoskeletal, extremity assessments. (R. 211).

8

## Administrative Hearing Testimony

### 1.
### Plaintiff's Testimony

At the beginning of Ms. Mueller's administrative hearing, Ms. Mueller's attorney conceded that, given the record, her alleged onset date of June 2002 was not sustainable. (R. 227). He explained that they were looking for any date sustainable by the evidence whether that be June 2006 or December 2006. (R. 227). He said:

> if the onset date's December '06, July '06, January '06, I mean, it doesn't – it's not an issue more to me than to get her in some sort of pay status, disabled. And of course, it has the benefit of taking out all the work activity, the drug use, and the jail and all that other fun stuff I got beyond that.

(R. 228). [3]

Ms. Mueller testified that she was on general assistance and food stamps. (R. 229). She had not gotten a medical card. (R. 230). She stated that she had trouble climbing stairs, but had no idea how far she could walk on level ground. (R. 230). She thought she could only stand for a half-hour before she had to sit down. (R. 231). She could sit for just 45 minutes. (R. 231). She testified that a doctor had told her to lay in bed with her feet elevated all day long. (R. 231). The ALJ, understandably incredulous, challenged Ms. Mueller on this point and she said that her doctor had actually told her she could do it for her comfort. (R. 231). She said she was unable to lift more than ten pounds. (R. 232). She had difficulty bending, stooping and crouching, but her balance was okay. (R. 232). She explained that her fingers fell asleep due to her congenital neck

---

[3] A claimant is not entitled to payment of benefits while incarcerated. 20 C.F.R. §404.468.

defect. (R. 232). She claimed her left leg is constantly swollen. (R. 243). She has difficulty sleeping at night. (R. 232).

Ms. Mueller related her history of bipolar disorder and said she had never been treated correctly with the correct medication. (R. 232). She was taking no medication for the condition. (R. 233). She last sought psychological treatment at the county health department. (R. 233). She gave herself shots of Lovenox to manage her blood clotting disorder. (R. 233). She said the last time she used cocaine was July of 2005. (R. 234). Once she got out of prison, she went to AA meetings for 15 months, but quit because she did not like going on her own. (R. 234-35).

Ms. Mueller sometimes has panic attacks, and has had difficulty concentrating since high school. (R. 235). She denied any memory loss, but said she had crying spells twice a week. (R. 235). She is able to take care of herself, cook, do the laundry, and drive about twice a week. (R. 237). She does not vacuum or dust or do the dishes. (R. 238).

## 2.
### Vocational Expert's Testimony

Edward Pagella testified as a vocational expert ("VE"). The ALJ asked Mr. Pagella whether a hypothetical individual of Ms. Mueller's age, education, and work history; who was capable of lifting 20 pounds occasionally and 10 pounds frequently; stand, walk, or sit for six hours a day, with the need for a sit/stand option; unable to climb ladders, ropes or scaffolding; and was limited to simple, unskilled work; could perform any jobs including Ms. Mueller's past relevant work. (R. 247). Mr. Pagella thought such a person could perform a wide variety of unskilled light occupations such as assembler

10

(6800 jobs), packer (5600 jobs), or sorter (4200 jobs). (R. 247). If such an individual were limited to sedentary work with a sit/stand option, and limited to only occasional contact with the public, co-workers, and supervisors, he or she could perform essentially the same occupations. (R. 248). Adding the necessity to avoid sharp objects did not change Mr. Pagella's answer. (R. 248). When challenged by Ms. Mueller's attorney that a person limited to sedentary work could not perform the same jobs as one limited to light work, Mr. Pagella indicated that the positions he described were all sedentary, sit/stand option positions. (R. 249-50). If a person can perform light work, he explained, it is assumed she can perform sedentary work as well. (R. 250).

### III.
### THE ALJ'S DECISION

The ALJ found that Ms. Mueller had not engaged in substantial gainful activity since June 2002. She had worked only briefly and sporadically since then. (R. 14). Next, he determined that Ms. Mueller had the following severe impairments: protein S deficiency, episodes of deep venous thrombosis, factor V mutation, bipolar disorder, and polysubstance dependence disorder, meaning that they met the Agency's requirement that a severe impairment significantly limit the ability to perform basic work activities. *See* 20 C.F.R. §§ 404.1520(c). (R. 14). The limited medical evidence as to other impairments mentioned in the record – mitral valve prolapse, irritable bowel syndrome, and her back and neck problems – failed to indicate those problems significantly limited her ability to perform work activity. (R. 14-15). The ALJ determined that Ms. Mueller's psychological impairment resulted in a mild degree of functional limitation in activities of daily living, social functioning, and maintaining concentration , persistence, and pace.

11

(R. 15). Ms. Mueller's impairments, according to the ALJ, neither singly nor in combination met or equaled an impairment listed in the Agency's regulations as disabling. (R. 30). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing of Impairments.

The ALJ went over the medical record thoroughly. (R. 15-18). She recounted the few instances of treatment or examination in depth. He made note of basically normal medical examinations in December 2003, and in October 2004. She did likewise with essentially unremarkable psychological consults in March 2004, June 2004, and October 2006. The ALJ considered Ms. Mueller's abnormal ultrasounds and her hospitalization and treatment in December 2006. She noted that the follow-up examination was completely normal. (R. 17-18). She also considered the only two residual functional capacity assessments in the record, from the Agency physicians. (R. 19). In the end, the ALJ felt the evidence demonstrated that Ms. Mueller could perform light work with a sit/stand option, that was simple and unskilled, and did not involve exposure to sharp objects. (R. 15).

The ALJ also considered Ms. Mueller's testimony. She went over her daily activities. She gauged her complaints against the medical evidence. She was troubled by portions of her testimony such as her assertion that she was under doctor's orders to keep her legs elevated all day long when there was no record of any such recommendation. She also noted that Ms. Mueller's alleged onset date was unsustainable due to her stints in prison. (R. 15, 18). The ALJ concluded that Ms. Mueller's impairment could be expected to produce the symptoms she alleged, but not to the degree she claimed. (R. 19).

Based on the residual functional capacity ("RFC") she found for Ms. Mueller, the ALJ concluded that she could not perform her past relevant work. The ALJ then looked to the Medical Vocational guidelines as a framework, stating that Ms. Mueller was a younger individual with a high school education, and found that Rule 202.21 would direct a finding of not disabled if she could perform a full range of sedentary work. (R. 20). She explained that this was not conclusive due to Ms. Mueller's additional limitations, and added that the VE had testified that an individual with Ms. Mueller's RFC could perform sedentary jobs with sit/stand options – which would be within the range of light work – that existed in significant numbers in the local economy, including assembler, packer, and hand sorter. (R. 20). As a result, the ALJ found that Ms. Mueller was not disabled and not entitled to DIB or SSI under the Act. (R. 20-21).

## IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is "very deferential," and thus "our role is extremely limited." We are not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations. Credibility determinations cannot be reversed unless the plaintiff can show they are "patently wrong." *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir.2006); *Schmidt,* 496 F.3d at 843. "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported ... can the finding be reversed." *Sims v. Barnhart,* 442 F.3d 536, 538 (7th Cir.2006). *Cf. Brown v.*

*Chater,* 87 F.3d 963, 966 (8th Cir.1996)("While these limitations, if accepted as credible, might have supported a disability finding, we will not substitute our opinion for that of the ALJ, who was in a better position to assess Brown's credibility than are we.").

Even if "'reasonable minds could differ concerning whether [plaintiff] is disabled,'" we must nonetheless affirm the ALJ's decision denying the disability claim if the decision is adequately supported by substantial evidence. 42 U.S.C. § 405(g); *Elder v. Astrue,* 529 F.3d 408, 413-14 (7th Cir.2008); *Berger,* 516 F.3d at 544; *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir. 1997).

Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion,* 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger,* 516 F.3d at 544; *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon,* 270 F.3d at 1176;

14

*Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544.

## B.
## The Required Five-Step Sequential Analysis

Section 423(d)(1) defines "disability" as: "(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Heckler v. Day*, 467 U.S. 104, 107 n.1 (1984); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) is the plaintiff currently unemployed;
>
> 2) does the plaintiff have a severe impairment;
>
> 3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
>
> 4) is the plaintiff unable to perform his past relevant work; and
>
> 5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

## C.
## Analysis

The record in this case more than amply supports the ALJ's decision. Ms. Mueller filed an application for DIB and SSI claiming she had been unable to work since June of 2002. At that time, the restaurant where she was working no longer needed her after she returned from a medical leave. It's unclear what that leave might have been for, because just prior to that, the only medical evidence of record consists of essentially normal blood and urinalysis test results. In the year after her alleged onset date, she used crack cocaine regularly and drank six to twelve beers a day. She was then incarcerated in late 2003 for forging checks and possession of cocaine. During her imprisonment, she worked in the kitchen.

Also while in prison, Ms. Mueller saw healthcare professionals – for the first time since May of 2001. Lab results were again normal. Physical exams mention minor injuries, her allergies to Coumadin and Tegretol, and her last bout with deep vein

16

thrombosis some five years prior to her alleged onset date. Ms. Mueller's psychological exams, while noting a history of bipolar disorder, were essentially unremarkable. Her mood disorder was treated with medication.

When she got out of prison in 2004, she worked part-time behind a grill. Her days were filled with work at the restaurant, chores at home, appointments with caseworkers, parole officers, and drug counselors, and playing billiards twice a week in a league. A consultative psychological exam found her essentially average, and able to understand and carry out instructions, sustain concentration, and interact socially and adapt in a work setting. A consultative physical examination was also essentially normal, including gait, range of motion, strength, sensation, reflexes, etc.

Ms. Mueller was back in prison in 2005 on drug charges. She was taking baby aspirin to ward off blood clots. Her mental state had been controlled with medication until she returned to cocaine use, and she was placed back on medication in prison. From the time she left prison for the second time in November of 2005, until July of 2006, there is no medical evidence of any health problems. At that time however, Ms. Mueller began to complain of left leg pain and had a Doppler test that was positive for thrombosis. The condition at first resolved with medication but by the December 2006, surgical intervention was required. This is arguably the only significant medical evidence in the record in terms of suggesting that Ms. Mueller suffered from a disabling impairment. But it covers a period of just six months, which does not meet the statutory definition of a "disability." 42 U.S.C. § 423(d)(1); *Day*, 467 U.S. at 107 n.1; *Skinner*, 478 F.3d at 844. In January 2007, Ms. Mueller's follow-up examination was normal.

Substantial evidence is not even a preponderance of evidence, but merely more than a scintilla of evidence. *Metropolitan Stevedore v. Rambo*, 521 U.S. 121, 149 (1997); *Schmidt*, 496 F.3d at 841-42. The reviewing court need not even agree with the ALJ's conclusion – so long as reasonable minds might different as to whether the claimant is disabled, the ALJ's decision must be upheld. *Id.* at 842. If the record in this case does not support the ALJ's decision that Ms. Mueller is not disabled, it is difficult to imagine a case in which there would ever be affirmance.

Quite apart from the ALJ's quite proper rejection of Ms. Mueller's testimony,[4] the only two RFC's provided by physicians – the Agency reviewers – fully supported the ALJ's decision. *See Cunningham v. Barnhart*, 440 F.3d 862, 865 (7th Cir. 2006)(proper for ALJ to rely on opinion of state agency physician); SSR 96-6p (while ALJ is "not bound by findings made by State agency or other program physicians and psychologists, but [he] may not ignore these opinions and must explain the weight given to the opinions in their decisions."). Moreover, the ALJ thoroughly discussed all the evidence, and fashioned a "logical bridge" from it to her conclusion. *See Giles*, 483 F.3d at 486.

Nevertheless, Ms. Mueller finds two or three flaws with the ALJ's decision. First, she argues that the ALJ did not find an RFC for her. (*Plaintiff's Memorandum in Support*, at 10). But that is simply not the case. The ALJ clearly stated that Ms. Mueller:

> has the residual functional capacity to perform work that is light in exertional demands, with an option to sit/stand at will due to her episodes of deep venous thrombosis. The work must be simple, unskilled because of impact of her bipolar disorder and polysubstance abuse disorder; and

---

[4] Not only were portions of her testimony not borne out by the objective evidence, Ms. Mueller's long felony record bore on her credibility. *See* rule 609, Federal Rules of Evidence.

18

she needs to avoid concentrated exposure to sharp objects in order to
avoid accidentally injuring herself due to her blood disorder.

(R. 15). That certainly constitutes an RFC finding.

Second, Ms. Mueller's brief revisits an issue her counsel raised at the hearing, namely, whether a person who can perform light work is presumed to be capable of performing sedentary work as well. (*Plaintiff's Memorandum in Support*, at 9-10). The ALJ thought Ms. Mueller could perform light work with a sit/stand option, but as it turned out, all of the jobs – over 15,000 – the VE posited were sedentary jobs with sit/stand options. As the VE tried to explain at the hearing, if someone can do light work, they can do sedentary work also. *See* 20 C.F.R. §§ 404.1567(b); 416.967(b).

Not only does this conclusion make good sense – and common sense counts in all contexts[5] – it is logical: if she can lift 20 pounds, she can lift 10; if she can walk frequently, she can walk occasionally. It does not matter if there are light jobs out there with a sit/stand option that Ms. Mueller cannot perform for some reason, because there are more than 15,000 sedentary jobs out there that she can. The ALJ was entitled to rely on the VE's testimony to conclude that Ms. Mueller was not disabled. *Haynes v. Barnhart*, 416 F.3d 621, 630 (7th Cir. 2005); *Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir.2002).

Finally, Ms. Mueller seems to argue that because she claimed she could not stand for more than a half-hour or sit for more than 45 minutes, the ALJ improperly relied on

---

[5] *See e.g., UNUM Life Ins. Co. of America v. Ward*, 526 U.S. 358, 367 (1999); *Mills v. Healthcare Services Corp.*, 171 F.3d 450, 457 n.5 (7th Cir. 1999); *Phelps Dodge Corp. v. Schumacher Elec. Corp.*, 415 F.3d 665 (7th Cir. 2005); *United States v. Sloan*, 505 F.3d 685, 695 (7th Cir. 2007); *Elkhatib v. Dunkin Donuts*, 493 F.3d 827 (7th Cir. 2007); *Peirick v. Indiana University-Perdue University Indianapolis Athletics Dept.*, 510 F.3d 681, 691 (7th Cir. 2007).

19

the VE's testimony that she could perform over 15,000 sedentary jobs with sit/stand options. (*Plaintiff's Memorandum in Support*, at 9-10). But she also testified that she was under doctor's orders to lay down with her feet elevated all day, every day, when that was not the case. For that and other reasons, the ALJ properly found her description of limitations exaggerated, and that finding cannot be reversed unless Ms. Mueller can show it was patently wrong. *Schmidt*, 496 F.3d at 843. She has not made an attempt to do so here and, given the record, it is doubtful that she could. As such, the ALJ's hypothetical to the VE was entirely appropriate and his subsequent reliance on the VE's testimony were entirely appropriate. *Schmidt*, 496 F.3d at 845-46 (7th Cir. 2007)(". . . ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible.").

## CONCLUSION

Cases involving review of an administrative law judge's decision denying social security benefits are often difficult: the claimants in many cases have experienced great upheavals in their lives and find themselves in unfortunate circumstances. But review of an administrative decision adverse to a claimant must give the required deference to the ALJ's conclusions where supported by substantial evidence. The Congress has determined that supplemental security income is not a form of unemployment insurance and is unavailable if the claimant is able to work-regardless of their chances of being hired. *See, e.g., Donahue v. Barnhart,* 279 F.3d 441, 443 (7th Cir.2002); *Jones v. Shalala,* 10 F.3d 522, 526 (7th Cir.1993). A reviewing court is not at liberty to reverse an otherwise proper decision of an ALJ merely because of the personal consequences to the

claimant that may result from an ALJ's fidelity to the text and purposes of the Social Security Act. *Compare I.N.S. v. Pangilinan*, 486 U.S. 875, 884 (1988); Cardozo, The Nature of the Judicial Process, 139-140 (1921); Frankfurter, *John Marshall and the Judicial Function,* Government Under Law, 31 (1956).

The plaintiff's motion for reversal and remand [#17] is DENIED, and the Commissioner's motion for summary judgment [#18] is GRANTED.

**ENTERED:**

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 11-24-08